## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

HAROLD NOLAN, Individually and on    )
Behalf of All Others Similarly Situated,    )
   )
         Plaintiff,    )
   )    Case No.  1:19-cv-03493
     v.    )
   )    **CLASS ACTION COMPLAINT FOR**
BEMIS COMPANY, INC., WILLIAM F.    )    **VIOLATIONS OF SECTIONS 14(a) AND**
AUSTEN, TIMOTHY M.    )    **20(a) OF THE SECURITIES**
MANGANELLO, DAVID S. HAFFNER,    )    **EXCHANGE ACT OF 1934**
ADELE M. GULFO, PHILIP G. WEAVER,    )
GEORGE WILLIAM WURTZ III, DAVID    )    **JURY TRIAL DEMANDED**
T. SZCZUPAK, ARUN NAYAR, HOLLY    )
A. VAN DEURSEN, GUILLERMO    )
NOVO, MARRAN H. OGILVIE,    )
KATHERINE C. DOYLE, and ROBERT    )
H. YANKER,

         Defendants.

Plaintiff Harold Nolan ("Plaintiff"), by his undersigned attorneys, alleges upon personal

knowledge with respect to himself, and information and belief based upon, *inter alia*, the

investigation of counsel as to all other allegations herein, as follows:

### NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the

other public holders of the common stock of Bemis Company, Inc. ("BMS" or the "Company")

against the Company and the members of the Company's board of directors (collectively, the

"Board" or "Individual Defendants," and, together with BMS, the "Defendants") for their

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange

Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17

C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between BMS

and Amcor Limited ("Amcor") to form New Amcor ("New Amcor").

2.    On August 6, 2018, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to receive 5.1 shares of common stock of New Amcor for each share of BMS stock they own (the "Merger Consideration").   Upon completion of the merger, Amcor stockholders will own 71 percent and BMS stockholders will own 29 percent of the combined company.

3.    On March 27, 2019, in order to convince BMS shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Form DEFM14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.  The materially incomplete and misleading Proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. 240.14a-9), each of which constitutes a violation of Section 14(a) and 20(a) of the Exchange Act.

4.    While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.    In particular, the Proxy contains materially incomplete and misleading information concerning the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that BMS shareholders vote in favor of the Proposed Merger.  The financial projections were also utilized by BMS's financial advisor, Goldman Sachs & Co. LLC. ("Goldman Sachs"), in conducting certain valuation analyses in support of its fairness opinion.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Merger.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholders vote on the Proposed Merger and taking any steps to consummate the Proposed Merger unless, and until, the material information discussed below is disclosed to BMS shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391 because BMS's common stock trades on the New York Stock Exchange, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of BMS common stock.

12.     Defendant BMS is incorporated in Missouri and maintains its principal executive offices at 2301 Industrial Drive, Neenah, Wisconsin 54956.  The Company's common stock trades on the NYSE under the ticker symbol "BMS."

13.     Individual Defendant William F. Austen is BMS's President and Chief Executive Officer and has been a director of BMS since August 2014.

14.     Individual Defendant Timothy M. Manganello is BMS's Chairman and has been a director of BMS since July 2004.

15.     Individual Defendant David S. Haffner has been a director of BMS since May 2004.

16.     Individual Defendant Adele M. Gulfo has been a director of BMS since June 2015.

17.     Individual Defendant Philip G. Weaver has been a director of BMS since May 2005.

18.     Individual Defendant George William Wurtz III has been a director of BMS since March 2018.

19.     Individual Defendant David T. Szczupak has been a director of BMS since November 2012.

20.     Individual Defendant Arun Nayar has been a director of BMS since February 2015.

21.     Individual Defendant Holly A. Van Deursen has been a director of BMS since January 2008.

22.     Individual Defendant Guillermo Novo has been a director of BMS since March 2018.

23.     Individual Defendant Marran H. Ogilvie has been a director of BMS since March 2018.

24.     Individual Defendant Katherine C. Doyle has been a director of BMS since January 2017.

25.     Individual Defendant Robert H. Yanker has been a director of BMS since March 2018.

26.     The Individual Defendants referred to in paragraphs 13-25 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of BMS (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

28.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of March 20, 2019, there were approximately 91,211,989 shares of BMS common stock outstanding, held by hundreds of individuals and entities scattered throughout the country. The actual number of public shareholders of BMS will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of

the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)   whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)  whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)   whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

I.     **The Proposed Merger**

29.     BMS is a global manufacturer of packaging products. The Company's 10-K explains that it is organized into three reportable business segments: U.S. Packaging, Latin America Packaging, and Rest of World Packaging. BMS mainly sells to companies in the following businesses: chemical, agribusiness, food, medical, pharmaceutical, personal care, electronics, industrial, and consumer goods. The majority of the Company's products are sold to companies in the food industry. The U.S. Packaging segment manufactures multilayer polymer, blown and cast film structures which are then converted to produce packaging for food, consumer and industrial companies. The Latin America Packaging segment manufactures multilayer polymer, blown and cast film structures which are then converted to produce packaging for food, medical, pharmaceutical, personal care, electronics and industrial applications. The Latin America Packaging segment also produces injection molded and thermoformed plastic. The Rest of World Packaging Segment manufactures multilayer polymer, blown and cast film structures which are then converted to produce packaging for food, electronics and industrial applications in Europe

and Asia-Pacific as well as medical and pharmaceutical packaging products for Europe, Asia-

Pacific, and the U.S.

30.    On August 6, 2018, BMS and Amcor issued a joint press release announcing the

Proposed Merger, which states in pertinent part:

> MELBOURNE, Australia & NEENAH, Wis.--(BUSINESS WIRE)--Amcor
> Limited (ASX: AMC) and Bemis Company, Inc. (NYSE: BMS) today announced
> that their respective Boards of Directors have unanimously approved a definitive
> agreement under which Amcor will acquire Bemis in an all-stock combination.
> Combining these two complementary companies will create the global leader in
> consumer packaging, with the footprint, scale and capabilities to drive significant
> value for shareholders, offer customers and employees the most compelling value
> proposition in the packaging industry and deliver the most sustainable innovations
> for the environment.
>
> The transaction will be effected at a fixed exchange ratio of 5.1 Amcor shares for
> each Bemis share, resulting in Amcor and Bemis shareholders owning
> approximately 71% and 29% of the combined company, respectively. This is
> equivalent to a transaction price of US$57.75 per Bemis share based on Amcor's
> closing share price of A$15.28[4] on August 3, 2018, and represents a premium of
> 25% to Bemis' closing price of US$46.31 per share as of August 2, 2018[5].
>
> Amcor's CEO, Ron Delia, said: "The strategic rationale for this combination and
> the financial benefits are highly compelling for both Amcor and Bemis
> shareholders. We are convinced this is the right deal at the right time for both
> companies, and with the right structure for both sets of shareholders to participate
> in a unique value creation opportunity. Amcor identified flexible packaging in the
> Americas as a key growth priority and this transaction delivers a step change in that
> region.
>
> "There are an increasing number of opportunities arising for a leading packaging
> company to capitalize on shifting consumer needs, an evolving customer landscape
> and the need to provide responsible packaging solutions that protect the
> environment. With this transaction, Amcor will have a stronger value proposition
> with the scale, breadth and resources to unlock value from these opportunities, for
> the benefit of our shareholders, customers and employees.
>
> "Amcor's financial profile will be enhanced, and our existing capital allocation
> framework, or shareholder value creation model, will be maintained and
> strengthened with this transaction. The combined company expects to have an
> investment grade balance sheet that provides immediate capacity for further
> disciplined investment as well as a compelling, progressive dividend. Amcor will
> draw on our extensive merger integration experience to deliver the substantial

benefits of this combination."

Bemis' President and CEO, William F. Austen, said: "The combination of Bemis and Amcor is transformational, bringing together two highly complementary organizations to create a global leader in consumer packaging. We believe this combination, which is an exGoldman Sachsng growth story for both companies, will benefit all stakeholders. Our employees will benefit as part of a larger and more global organization focused on a commitment to customer service, integrity and supporting strong teams. In addition, the combination will enable us to offer global, regional and local customers the most compelling value proposition in the industry through a broader product portfolio, increased product differentiation and enhanced operating capabilities, while leveraging Bemis' extensive U.S. manufacturing base and strengths in material science and innovation. Our shareholders will receive a significant premium in this transaction, reflecting the value we've built as an organization, as well as the opportunity to continue to participate in the upside potential of a more diversified combined company with greater scale and resources. We look forward to working together with Amcor to ensure a seamless integration."

Amcor's CEO, Ron Delia, concluded, "Amcor and Bemis have many things in common starting with proud histories that date back more than 150 years. Both companies are grounded in strong values, a shared commitment to innovation and value-added consumer packaging, and have talented management teams."
"We have always had a great deal of respect for Bemis and we are thrilled that its team in Wisconsin and around the world will be joining Amcor. Many people at Amcor today have joined us through acquisitions, including many of our leadership team, and we would expect Bemis to be well represented in Amcor at all levels of the organization."

**Strategic Rationale**

After completion of the transaction, Amcor will have a stronger and more differentiated value proposition for global, regional and local customers through:

- Comprehensive global footprint with more balanced, profitable exposure to emerging markets: A global flexible packaging footprint across key geographies; a larger, more balanced and more profitable emerging markets business, with sales of some US$3.5 billion from around 30 emerging markets;
- Greater scale to better serve customers in every region: Increased economies of scale and resources through Amcor's leading positions in Europe, Asia and Latin America, and Bemis' leading positions in North America and Brazil;
- Increased exposure to attractive end markets and product segments: An enhanced growth profile from greater global participation in protein and healthcare packaging, leveraging innovative technologies in barrier films and foils;
- Best-in-class operating and innovation capabilities: Greater differentiation to innovate and meet customer demands for new and sustainable products through the deployment of proven, industry-leading commercial, operational and R&D

capabilities;
- A continued strong commitment to environmental sustainability: Enhanced capabilities behind Amcor's pledge to develop all recyclable or reusable packaging products by 2025; and
- Greater depth of management talent: A stronger combined team by bringing the significant strengths and quality of the workforce across both companies.

**Financial Rationale**

The combination creates substantial value for shareholders of both companies through:

- Compelling transaction metrics:
  - all-stock acquisition at an implied value in line with Amcor's current trading EV/EBITDA multiple, pre cost synergies;
  - pre-tax annual cost synergies of approximately US$180 million (representing approximately 4% to 5% of Bemis sales) by the end of the third year from procurement, manufacturing and G&A efficiencies[6], incremental to Bemis' "Agility" improvement plan;
  - double digit proforma EPS[2] accretion for all shareholders inclusive of cost synergies at full run rate[1]; and
  - double digit returns in excess of Amcor's Weighted Average Cost of Capital (WACC).
- Stronger financial profile going forward:
  - higher margins through the delivery of cost synergies;
  - potential to grow at higher rates over the long term through a stronger customer value proposition; and increased exposure to attractive segments, which would be additive to the transaction metrics;
  - annual cash flow, after capital expenditure and before dividends, in excess of US$1 billion; and
  - investment grade balance sheet with immediate capacity for further investment.
- Greater liquidity for investors:
  - through a primary listing on the New York Stock Exchange ("NYSE") and a listing on the Australian Securities Exchange ("ASX") via CHESS Depositary Interests ("CDI's"); and
  - expected inclusion in both the US S&P 500 index as well as in the S&P / ASX 200 index.
- Cash and tax free:
  - cash and tax free transaction for shareholders in a share for share exchange.

**Transaction Structure**

The combination will be effected through a merger of Amcor and Bemis into a newly created holding company ('New Amcor') incorporated in Jersey. It is intended that New Amcor will be tax resident in the UK after closing. New Amcor will have a primary listing on the NYSE and a listing on the ASX. Amcor and

Bemis shareholders will receive shares in New Amcor in a tax-free exchange. Existing Amcor shareholders will have the option to receive one New Amcor ASX listed CDI or one New Amcor NYSE listed share for each Amcor share held. Bemis shareholders will receive 5.1 New Amcor NYSE shares for each Bemis share held, resulting in Amcor and Bemis shareholders owning approximately 71% and 29% of the combined company, respectively.

This structure has several key benefits, including:

- Listings on two major global exchanges with primary listing on the NYSE and an ASX listing via CDIs;
- Expected index inclusion in the S&P 500 of the full market capitalization of the combined company (estimated at US$17 billion[3]) and pro-rata inclusion of CDIs in the S&P / ASX 200 index, resulting in greater liquidity and considerably increased index buying; and
- Ongoing financial strength and funding flexibility for continued investment.

**Financial effects**

After completion of the transaction it is expected that key aspects of Amcor's financial profile will remain largely unchanged, including:

- A compelling, progressive dividend which will continue to be an important component of annual shareholder returns;
- Post closing, the first annual dividend paid by New Amcor is expected to be no less than the value of the last annual dividend per share declared by Amcor prior to completion of the transaction, providing significant dividend per share accretion to Bemis shareholders; and
- An on-going capital allocation philosophy consistent with Amcor's shareholder value creation framework.

**Governance and Community**

Upon completion of the transaction, New Amcor's Board is expected to comprise 11 members, 8 of whom are current Amcor directors, and 3 of whom are current Bemis directors. Amcor's current Chairman, Graeme Liebelt and current CEO Ron Delia will continue in those roles after the transaction and Mr. Delia will continue to serve as the only Executive Director on the Board.

New Amcor will continue to maintain a critical presence in Wisconsin and other key Bemis locations. The combined company also expects to leverage Bemis' plant network and innovation center while continuing to invest in the U.S. New Amcor will continue to support the communities in which Bemis operates and announced today a contribution of US$35,000 to the Bemis Foundation on behalf of Amcor's 35,000 employees world-wide.

**Conditions to the Transaction and Other Terms**

Closing of the transaction is conditional upon the receipt of regulatory approvals, approval by both Amcor and Bemis shareholders, and satisfaction of other customary conditions. Subject to the satisfaction of the conditions to closing, the transaction is targeted to close in the first quarter of calendar year 2019.

Under the terms of the transaction agreement, prior to closing each party will be permitted to continue paying dividends in an amount and on timing consistent with past practice.

The full terms of the transaction, including the closing conditions and other terms described herein, are set out in the transaction agreement, which is lodged in a separate announcement.

**Analyst and investor briefing**

Amcor and Bemis will hold two joint calls for analysts and investors:

- Conference call 1 – August 6: 8:30 am US Central Daylight Time / 9:30 am US Eastern Daylight Time / 11:30 pm Australian Eastern Standard Time. Participant code 8388696
- Conference call 2 – August 7 Australia / August 6 US: 10:00 am Australian Eastern Standard Time / 07:00 pm US Central Daylight Time / 08:00 pm US Eastern Daylight Time. Participant code 9992019
  To access the presentation slides, go to www.Amcor.com and click on the relevant link after scrolling down on the homepage or the investors page, or go to www.Bemis.com and click on the presentations section. We recommend participants dial in 10 to 15 minutes prior to the start of the presentation using the teleconference details below:

| | |
|---|---|
| Australia | 1800 175 864 / +61 2 8373 3507 |
| United States | 1855 823 0291 / +1 469 666 9932 |
| Canada | 1855 277 1647 / +1 64 7426 9741 |
| United Kingdom | 0808 234 1368 / +44 20 3651 4875 |
| Hong Kong | 800 963 435 / +852 3051 2791 |
| All other countries | +61 2 8373 3550 |

**Advisors**

UBS AG, Australia Branch and Moelis & Company LLC are acting as joint financial advisors and Kirkland & Ellis and Herbert Smith Freehills as legal counsel to Amcor.

Goldman Sachs & Co LLC is acting as financial advisor and Faegre Baker Daniels LLP, Cleary Gottlieb Steen & Hamilton LLP and MinterEllison as legal counsel to

Bemis.

**Overview of Amcor**

Amcor is a global leader in responsible packaging solutions, supplying a broad range of rigid and flexible packaging products into the food, beverage, healthcare, personal care and other fast moving consumer end markets. Amcor operates around 195 sites in over 40 countries, with approximately 35,000 employees. For the year ended 30 June 2017, Amcor generated revenues of US$9.1 billion and EBITDA of US$1.4 billion.

**Overview of Bemis**

Bemis Company, Inc. ("Bemis") is a supplier of flexible and rigid plastic packaging used by leading food, consumer products, healthcare, and other companies worldwide. Founded in 1858, Bemis reported 2017 net sales of US$4.0 billion. Bemis has a strong technical base in polymer chemistry, film extrusion, coating and laminating, printing, and converting. Headquartered in Neenah, Wisconsin, Bemis employs approximately 16,000 individuals worldwide. More information about Bemis is available at our website, www.Bemis.com.

31.     BMS is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

**II.     The Materially Incomplete and Misleading Proxy**

32.     On March 29, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed

decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### The Materially Misleading Sales Process

33.    According to the *Background of the Transaction*, before the Company agreed to the Proposed Merger with Amcor, BMS spoke with four other potential bidders. The discussions with Party A ended when Party A did not make a specific offer, Proxy 81, and with Party B when Party B was not interested in making any offer. *Id.* at 78. On May 21, 2018, the Company and Amcor signed a mutual confidentiality and standstill agreement, and on June 8, 2018 the Company entered into a confidentiality agreement with Party D. *Id.* at 81-82. Party C was advised that if it was still interested in a business combination it needed to make a formal written proposal. *Id.* at 82. However, Party C believed that the two companies needed to enter into a confidentiality agreement before it was able to make an offer. *Id.* at 83. On July 13, 2018, Party C stated it was still interested but did not want to make a proposal to acquire the Company outright. *Id.* at 84. Management did not continue discussions with Party C. Although Party D did sign a confidentiality agreement and was given access to non-public information, discussions did not advance beyond the preliminary stage. *Id.* at 82.

34.    According to the terms of *The Transaction Agreement*, Amcor and BMS have agreed they will not "amend, grant any waiver or release under or fail to enforce any standstill or similar agreement with respect to any class of its equity securities or equity securities of any of its subsidiaries . . . ." *Id.* at 147. This language indicates that in addition to the standstill provisions Amcor and the Company agreed to, the confidentiality agreement also contained a "don't ask don't waive" ("DADW") provision.

35.     *The Background of the Merger* does not state whether the confidentiality agreement the Company entered into with Party D contained a standstill provision and/or a DADW provision. The existence of either of the provisions in the confidentiality agreement is material to the Company's shareholders because they relate to Party D's ability to offer a better deal. If the confidentiality agreements did contain a DADW provision, then Party D would only be allowed to make one bid and, by the terms of the agreement, be incapable of making a superior proposal. The omission of this material information renders the *Background of the Merger* section materially misleading. A shareholder needs to know detailed information about the sales process to determine if the Merger Consideration is truly a fair representation of the company's value, and the knowledge of whether or not a party is precluded from making a topping bid would be information any reasonable shareholder would find material.

### The Materially Misleading Financial Analyses

36.     On March 27, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Financial Projections that Violate Regulation G and SEC Rule 14a-9

37.     The Proxy fails to provide material information concerning the Company's financial projections, which were developed by the Company's management and relied upon by

the Board in recommending that the shareholders vote in favor of the Proposed Merger. *Id.* at 90-91.

38.    The financial projections at issue were relied upon by the Company's financial advisor, Goldman Sachs, in connection with its valuation analyses and respective fairness opinions. *Id.* at 94. Specifically, the Proxy provides values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics from 2018-2021 (the "Bemis Forecasts") for: (1) Adjusted EBITDA, (2) EBITDA, (3) Adjusted EBIT, (4) Adjusted Earnings Per Share and (5) Unlevered Free Cash Flow but fails to provide (i) the line items used to calculate these non-GAAP metrics nor (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). *Id.* at 105-108.

39.    The Company defines "EBITDA" as a non-GAAP financial measure calculated as earnings before interest, tax, depreciation and amortization and "Adjusted EBITDA" as a non-GAAP financial measure calculated as earnings before interest, tax, depreciation and amortization adjusted to exclude restructuring and related costs and acquisition costs. *Id.* at 105 n.1-3. However, the Proxy fails to provide the values of any of these line items and fails to reconcile Adjusted EBITDA to its most comparable GAAP equivalent. *Id.* at 105. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the Board and Goldman Sachs to recommend the unfair Merger Consideration, and its omission renders the Board's recommendation, the projected financials, Goldman Sachs' valuations and the Merger Consideration misleading.

40.    Similarly, "Adjusted EBIT" is described as a non-GAAP financial measure calculated as earnings before interest and tax adjusted to exclude restructuring and related costs and acquisition costs. *Id.* at 105 n.1-2, n.4. The Company again fails to provide the values of any

of these line items and fails to reconcile Adjusted EBIT to its most comparable GAAP equivalent. *Id.* at 105. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the Board and Goldman Sachs to recommend the unfair Merger Consideration, and its omission renders the Board's recommendation, the projected financials, Goldman Sachs' valuations and the Merger Consideration misleading.

41. The Company also defined "Adjusted Earnings Per Share," which it described as a non-GAAP financial measure adjusted to exclude restructuring and related costs and acquisition costs. *Id.* at 105 n.1-2. Additionally, the company notes:

> For purposes of Goldman Sachs' financial analyses and opinion described under "—Opinion of Bemis' Financial Advisor" beginning on page 94 of this proxy statement/prospectus, the adjusted earnings per share figures originally included in the Bemis Forecasts (which were prepared beginning in November 2017) were revised by Bemis' management to update certain inputs to the model of future projected share repurchases based on more current information, including an updated beginning share count number derived from Bemis' Quarterly Report on Form 10-Q for the quarter ended June 30, 2018. Prior to such adjustments, the adjusted earnings per share for the fiscal years ending 2019 and 2020 included in the Bemis Forecasts were $3.39 and $4.22, respectively.

*Id.* at 105 n.5. The Company failed to provide the values of any of these line items and failed to reconcile Adjusted Earnings Per Share to its most comparable GAAP equivalent. *Id.* at 105. This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the Board and Goldman Sachs to recommend the unfair Merger Consideration, and its omission renders the Board's recommendation, the projected financials, Goldman Sachs' valuations and the Merger Consideration misleading.

42. Additionally, the Company explains that Goldman Sachs calculated "Unlevered Free Cash Flow" (UFCF) using the Bemis Forecasts and additional information provided by BMS's management. The Company defines UFCF as a non-GAAP financial measure and provided

a chart displaying that UFCF was calculated as EBITDA minus capital expenditures minus (increase) decrease in net working capital minus taxes on EBIT plus other cash flow items. *Id.* Other cash flow items were defined as "other cash flow items per Bemis Forecasts. Does not include add-back for non-cash share-based compensation." *Id.* at 106 n.5. However, no more information about the other cash flow items appears in the Company's forecasts.

43.    Although Goldman Sachs calculated the UFCF, Goldman Sachs used management's projections and additional information provided by management. Additionally, the Company reviewed and approved Goldman Sachs' UFCF calculations before Goldman Sachs used them in its analysis. The company then disclosed the UFCF calculations outside of Goldman Sachs' fairness opinion with the other management forecasts. Therefore, the lack of a reconciliation of UFCF to its most comparable GAAP equivalent is misleading because the Company regularly analyzes and reports its cash flows.[1] This omitted information is material because it was used to calculate and project critical projected financial measures utilized by the Board and Goldman Sachs to recommend the unfair Merger Consideration, and its omission renders the Board's recommendation, the projected financials, Goldman Sachs' valuations and the Merger Consideration misleading.

44.    When a company discloses non-GAAP financial measures in a registration statement that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or

---

[1] *See* BMS, 2018 Annual Report (Form 10-K) pp. 28-29, 40 (Feb. 15, 2019).

released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

45.    Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique, company-specific non-GAAP financial measures (as BMS included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[2]

46.    Thus, in order to bring the Proxy into compliance with Regulation G as well as cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures and/or disclose the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures.  Such projections are

---

[2]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited Apr. 19, 2019).

necessary to make the non-GAAP projections included in the Proxy not misleading.

### The Materially Misleading Financial Analyses

47.    The financial projections at issue were relied upon by the Company's financial advisor, Goldman Sachs, in connection with its valuation analyses and respective fairness opinions. Proxy 94.   The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.   Once a registration statement discloses internal projections relied upon by the Board, those projections must be complete and accurate.

48.    With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis*, the Proxy states that after applying a range of next twelve months forward EBITDA multiples to the Bemis Forecasts for the years 2018-2020, Goldman Sachs then subtracted the net debt and amounts attributable to pension underfunding for BMS as of December 31 for each of the years 2018 to 2020 as provided by the Company's BMS. *Id* at 96. Goldman Sachs then divided the range of illustrative equity values it derived by the fully diluted Company shares estimated to be outstanding as of December 31 for each of the years 2018-2020 as provided by the Company's management. *Id.* Goldman Sachs then added the cumulative dividends per share expected to be paid to Bemis shareholders in each of the years 2018-2020, based on the Bemis Forecasts. *Id.* Goldman Sachs then discounted the December 31, 2018-2020 implied values using a discount rate of 7.5% calculated through application of the capital asset pricing model ("CAPM"). *Id.*

49.    None of the above stated information that was provided to Goldman Sachs by the Company's management has been disclosed in the Proxy. There is no mention of the net debt, amounts attributable to pension underfunding, estimated shares outstanding, or BMS's beta anywhere in the proxy other than Goldman Sachs' analysis. The Proxy does disclose that dividends

are expected to increase by $0.04 per share annually, but that does not distinguish between preferred and common stock. *Id.* at 105. Additionally, it is unclear that Goldman Sachs even used this exact number in its calculation since Goldman Sachs says the cumulative dividends per share added to the calculation were *based* on the Bemis Forecasts, not necessarily the number disclosed in the forecasts. *Id.* at 96.

50.    Because the line items used in Goldman Sachs' *Illustrative Present Value of Future Share Price Analysis* were not disclosed, shareholders are unable to discern the veracity of Goldman Sachs' analysis. Without further disclosure, shareholders are unable to compare Goldman Sachs' calculations with the Company's financial projections. Indeed, Goldman Sachs calculated the range of implied present values of the future share price to be between the extremely large range of $39 and $67. *Id.* Shareholders need all the values Goldman Sachs used for net debt, amounts attributable to pension underfunding, estimated shares outstanding, BMS's beta and the cumulative dividends per share in order to be able to become fully informed and determine the fairness of the Merger Consideration. Without any single piece of the above omitted information, shareholders will be incapable of analyzing where in Goldman Sachs' range they believe the Company's stock will fall and therefore will be unable to properly determine the fairness of the Merger Consideration. Thus, without the omitted information, the Company's shareholders are being materially misled regarding the value of the Company.

51.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis*, the Proxy states that using discount rates ranging from 6.5% to 7%, reflecting estimates of the Company's weighted average cost of capital (WACC), Goldman Sachs

> discounted to present value as of June 30, 2018 (i) estimates of unlevered free cash flow for Bemis for the last two quarters in 2018 and the years 2019 through 2021 as reflected in the Bemis Forecasts and (ii) a range of illustrative terminal values for Bemis, which were calculated by applying terminal exit multiples of the last

twelve months EBITDA ("LTM EBITDA") ranging from 9.0x to 11.0x, to a terminal year estimate of the EBITDA to be generated by Bemis, as reflected in the Bemis Forecasts.

*Id.* at 97. Additionally, Goldman Sachs states that it derived the discount rates by using the capital asset pricing model, which requires the company's target capital structure weightings, the cost of long-term debt, after tax yield on permanent excess cash, future applicable marginal cash tax rate and the beta for the Company. *Id.* Finally, Goldman Sachs derived the illustrious enterprise values and subtracted the net debt and amounts attributable to pension underfunding as provided by the Company's management. *Id.*

52.     Despite the Company disclosing the unlevered after-tax free cash flow projections Goldman Sachs used, the Company does not provide the majority of the other information it provided to Goldman Sachs for the *Illustrative Discounted Cash Flow Analysis*. The Company did not disclose the value Goldman Sachs calculated for the terminal value, the Company's cost of long-term debt, after tax yield on permanent excess cash, the beta of the Company, the net debt or the amount attributable to pension underfunding. Since these line items were not disclosed, shareholders are unable to discern the veracity of Goldman Sachs' *Illustrative Discounted Cash Flow Analysis*. Without further disclosure, shareholders are unable to compare Goldman Sachs's calculations with the Company's financial projections. The absence of any single piece of the above information renders Goldman Sachs' *Illustrative Discounted Cash Flow Analysis* incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

53.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation."

Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . " *Id*. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

54.     These omissions from the *Discounted Cash Flow Analysis* are all the more misleading because the Merger Consideration falls at the bottom of the equity value range Goldman Sachs calculated. On April 17, 2019, Amcor stock closed at 15.38 AUD per share on the Australian Securities Exchange. On April 17, 2019, the exchange rate of AUD to USD was 1 AUD to .72 USD. Therefore, using the exchange rate of 5.10 shares per share of BMS, the Merger Consideration is valued at $56.47. Goldman Sachs's *Discounted Cash Flow Analysis* estimated the implied per share equity value of BMS to be $55 to $69. Therefore, in order for BMS shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

55.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading. As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Merger from BMS shareholders.

56.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

59.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a). SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure. 17 C.F.R. § 244.100(a).

60.    The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

61.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

62.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

63.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

64.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

65.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed

to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

66.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

67.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

68.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

69.     BMS is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the

Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

### COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

71.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

72.     The Individual Defendants acted as controlling persons of BMS within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of BMS, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

73.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the Proxy.

75.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

76.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

77.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Merger;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 19, 2019

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _/s/ James M. Wilson, Jr._

Nadeem Faruqi
James M. Wilson, Jr.
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
       jwilson@faruqilaw.com

*Counsel for Plaintiff*